## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

UNITED STATES OF AMERICA,
*ex rel*., KEVIN KONDRAT and
JESSICA JONES,

               Plaintiffs-Relators,

-vs-

SIEMENS CORPORATION, a foreign
corporation; SIEMENS INDUSTRY, INC.;
a foreign corporation; and SIEMENS
BUILDING TECHNOLOGIES, INC., a
foreign corporation, jointly and severally,

               Defendants.

_____/

Civil Action No. 21-10594
Hon. Victoria A. Roberts
Magistrate Judge Curtis Ivy, Jr.

**MATTER FILED IN
CAMERA AND UNDER SEAL**

**HERTZ SCHRAM PC**
Patricia A. Stamler (P35905)
Matthew J. Turchyn (P76482)
*Attorneys for Plaintiffs-Relators*
1760 S. Telegraph Road, Suite 300
Bloomfield Hills, MI 48302
(248) 335-5000
pstamler@hertzschram.com
mturchyn@hertzschram.com

_____/

## <u>COMPLAINT AND DEMAND FOR JURY TRIAL</u>

NOW COME Plaintiffs-Relators, KEVIN KONDRAT and JESSICA JONES

(hereafter "Relators"), on behalf of themselves, and on behalf of the United States

of America, by and through their attorneys, HERTZ SCHRAM PC, and hereby file

{H0820752.1}

their Complaint under the False Claims Act ("FCA"), 31 U.S.C. § 3729, *et seq*., the

Fraud Enforcement and Recovery Act of 2009 ("FERA" ), 31 U.S.C. §§ 3729-3733,

and the Civil Monetary Penalties Law, 42 U.S.C. §§ 1320a-7(b)(7), (collectively

"Acts") and state as follows:

## INTRODUCTION

1.      This case involves a scheme by Defendants, Siemens Corporation;

Siemens Industry, Inc.; and Siemens Building Technologies, Inc. (collectively,

"Siemens"), to defraud the United States Government, specifically the Department

of Housing and Urban Development ("HUD") by falsifying data, which led to the

submission of false claims to HUD programs that incentivize HUD-participant

public housing authorities ("PHAs") to make energy-saving capital improvements.

Siemens entered into a HUD-approved contract with the Hamtramck Housing

Commission ("HHC") where Siemens guaranteed a certain level of savings on the

HHC's utilities from energy-saving improvements that Siemens was to install. HUD

was and is the funding source for the "energy-saving" improvements and for the

HHC's utilities' bills.

2.      In the process of seeking HUD approval for its contract with the HHC,

Siemens deliberately overstated the HHC's baseline pre-improvement water usage.

3.      These misrepresentations were made for Siemens's own benefit

because they enabled Siemens to secure a higher level of government funding than

it otherwise would have been entitled to, thereby increasing its own revenue by millions of taxpayer dollars. These misrepresentations also ensured that Siemens was always on the "right side" of its guarantees (falsely reflecting cost savings) to the HHC, which ensured that Siemens would not be held responsible for failing to deliver the energy savings that it promised when it sought HUD approval. Siemens's misrepresentations are blatant violations of the False Claims Act, 31 U.S.C. § 3729 et seq. (the "FCA").

## JURISDICTION AND VENUE

4.     This action arises under the Acts of the United States of America to recover treble damages and civil penalties on behalf of the United States of America arising out of Defendants' submission of false claims to the United States through the Department of Housing and Urban Development ("HUD").

5.     31 U.S.C. § 3732 provides that this Court has exclusive jurisdiction over actions brought under the federal FCA. In addition, jurisdiction over this action is conferred on this Court by 28 U.S.C. § 1345 and 28 U.S.C. § 1331 because this civil action arises under the laws of the United States.

6.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 and § 3732(a) of the FCA which provides that "any action under 3730 may be brought in any judicial district in which the Defendant or, in the case of multiple Defendants, any one Defendant can be found, resides, transacts business, or in which any act

prescribed by § 3729 occurred." The acts which are the subject of this action, occurred in the Eastern District, including the City of Hamtramck, in the State of Michigan.

7.     As required under § 3730(b)(2) of the FCA, Relator provided to the Attorney General of the United States prior to the filing of this Complaint, a statement of all material evidence and information related to the Complaint (the "Evidentiary Disclosure").

8.     Relator is the original source of the information of the allegations contained in this Complaint.

## PARTIES

9.     Relator Kevin Kondrat ("Kondrat") for all times relevant to this Complaint is a resident of the city of Grosse Pointe, Michigan, located in the Eastern District of Michigan, and for all times relevant to this Complaint is the Executive Director of the HHC.

10.    Relator Jessica Jones ("Jones") for all times relevant to this Complaint is a resident of the city of South Rockwood, Michigan, located in the Eastern District of Michigan, and for all times relevant to this Complaint is the Program Manager for the HHC.

11.    Defendant Siemens Corporation is a Delaware corporation, licensed to do business in the State of Michigan that conducts business the Eastern District of Michigan.

12.    Defendant Siemens Industry, Inc. is a Delaware Corporation licensed to do business in the State of Michigan that conducts business the Eastern District of Michigan.

13.    Defendant Siemens Building Technologies, Inc. is a Delaware corporation licensed to do business in the State of Michigan that conducts business the Eastern District of Michigan.

## GENERAL ALLEGATIONS

14.    The HHC is a public housing authority ("PHA") in Hamtramck, Michigan that participates in HUD's Public Housing Program. The HHC operates several public housing developments, including Colonel Hamtramck Homes ("Colonel Hamtramck") and Hamtramck Senior Plaza ("Senior Plaza").

15.    Realtors, in their respective capacities, have personal knowledge of the HHC's interactions with Defendants with respect to the false claims submitted to HUD.

16.    This qui tam case centers on Defendants' scheme where each Defendants took advantage of the Government programs it uses to service PHAs by creating a "self-funded" program based on misrepresentations regarding HHC's

utility use. These misrepresentations allowed Defendants to obtain Government funding far in excess of the amount that HUD would have otherwise approved.

17.     Siemens purports to be "a global technology powerhouse" that provides infrastructure and energy services to its customers in numerous industries. About Us, SIEMENS, https://new.siemens.com/global/en/company/about.html (last visited Feb. 25, 2021). In the 2020 fiscal year, Siemens "generated revenue of €57.1 billion and net income of €4.2 billion." *Id.* "As of September 30, 2020, the company had around 293,000 employees worldwide." *Id.* Siemens has public and private-sector customers in various industries, including manufacturing, infrastructure, mobility, healthcare, financial services, and real estate. Our Offering, SIEMENS, https://new.siemens.com/global/en/company/about/businesses.html (last visited Feb. 25, 2021).

18.     Siemens touts the services it provides to HUD-participant PHA's[1]. Siemens represents that "[n]ew energy- and water-efficient equipment could save thousands of capital dollars through reduced long-term energy and water bills" for PHAs. *Id* at n.1. Further, "[a]s most publicly financed facilities lack the up-front project funds necessary to accomplish large-scale efficiency projects, your agency

---

[1]     Public Housing Authorities, SIEMENS, https://www.downloads.siemens.com/download-center/Download.aspx?pos=download&fct=getasset&id1=A6V10612750 (last visited Feb. 25, 2021).

can benefit from entering into a partnership with Siemens to purchase and install the equipment you need." *Id.*

19.    Siemens claims that improvements it provides for PHAs can be "paid for with energy cost savings." *Id.* Siemens asserts that this is accomplished through Government programs that address PHAs' "capital needs while providing incentives for reduced utility costs." *Id.* Siemens claims that "[t]hrough our guaranteed energy performance-based solutions, Siemens has worked with PHAs across the country to audit facilities and implement facility improvements — resulting in guaranteed, self-funding programs." *Id.* Siemens represents that a typical energy cost savings project for a PHA may include:

- Water conservation measures (installation of commodes, aerators, leak repair and showerheads)
- Weatherization in cold climates (air sealing and insulation)
- Lighting retrofits
- Central air conditioning and heating plant systems
- Indoor Environmental Quality (mold and mildew)
- New plumbing equipment
- Replacement of aging utility distribution systems
- Upgrades to building envelopes, including new doors and windows
- New energy-saving appliances
- Resident training
- Installation of metering and controls for energy management
- Improved lighting levels (while reducing consumption)
- Solutions to infrastructure needs with no outlay of capital funds

*Id.*

## **LEGAL FRAMEWORK**

20.    The Federal FCA imposes liability on:

> [A]ny person who—
>
> > (A)    knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or]
> >
> > (B)    knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim[.] (31 U.S.C. §§ 3729(a)(1)(A) and (B)).

21.    The term "knowingly" means "that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." (31 U.S.C. § 3729(b)(1)(A)). Proof of specific intent to defraud is not required. (See 31 U.S.C. § 3729(b)(1)(B)).

22.    Section 3729(a)(1) of the Federal FCA provides that a person is liable to the United States Government for three times the amount of damages that the Government sustains because of the act of that person plus a civil penalty of $5,000–$10,000 per violation. Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990 (Pub. L. 101-410), as amended by the Debt Collection Improvement Act of 1996 (Pub. L. 104-134) and the Federal Civil Penalties Inflation Adjustment Act of 2015 (Pub. L. 114-74), the Federal FCA's penalty range is periodically adjusted for inflation. For Federal FCA violations that occurred on or before November 2, 2015, the penalty range is $5,500–$11,000 per violation. And for Federal FCA

violations that occurred after November 2, 2015, the penalty range is presently $11,181–$22,363 per violation. (See 28 C.F.R. §§ 85.3 and 85.5 (2018)).

## RELEVANT HUD STATUTES AND REGULATIONS

23.     HUD's Public Housing Program "was established to provide decent and safe rental housing for eligible low-income families, the elderly, and persons with disabilities." HUD's Public Housing Program, HUD.GOV, https://www.hud.gov/topics/rental_assistance/phprog (last visited Feb. 25, 2021). There are approximately 1.2 million households living in public housing units, managed by some 3,300 PHAs. *Id.* HUD administers Federal aid to PHAs that manage the housing for low-income residents at rents they can afford. *Id.* HUD furnishes technical and professional assistance in planning, developing, and managing these developments. *Id.*

24.     In addition to the goal of creating safe, decent, and affordable housing, HUD's Office of Public and Indian Housing ("PIH") was created to generate "opportunities for residents' self-sufficiency and economic independence," and assure "the fiscal integrity of all program participants." About PIH, HUD.GOV, https://www.hud.gov/program_offices/public_indian_housing/about (last visited Feb. 25, 2021).

25.     HUD's Public Housing Operating Fund provides operating subsidies to housing authorities to assist in funding the operating and maintenance expenses of

their own dwellings, in accordance with Section 9 of the U.S. Housing Act of 1937, as amended. The subsidies are required to help maintain services and provide minimum operating reserves. Public Housing Programs, HUD.GOV, https://www.hud.gov/program_offices/public_indian_housing/programs/ph/programs#:~:text=The%20Public%20Housing%20Operating%20Fund,Act%20of%201937%2C%20as%20amended (last visited Feb. 25, 2021).

26.     The United States Housing Act of 1937 (1937 Act) requires that "the treatment of utility and waste management costs under the [Operating Fund] formula shall provide that a public housing agency shall receive the full financial benefit from any reduction in the cost of utilities or waste management resulting from any contract with a third party to undertake energy conservation improvements in one or more of its public housing projects." 42 U.S.C. § 1437g(e)(2)(C).

27.     Energy conservation measures ("ECMs") include improvements to other utilities such as water and gas. PHAs may qualify for conservation incentives when undertaking ECMs that are financed by an entity other than HUD.  24 C.F.R. 990.185.

28.     The 1937 Act has been amended in 2005 by The Energy Policy Act of 2005 and in 2008 by the Consolidated Appropriations Act of 2008. 42 U.S.C. §13201 et seq.  and Public Law 110-161, respectively. The Department issued an Interim Rule (Federal Register Notice FR-5057-I-01), effective November 17, 2008, that

made conforming amendments to the regulations of the Public Housing Operating

Fund       Program       to       reflect       these       statutory       amendments.

https://files.hudexchange.info/resources/documents/Pih-Notice-2011-36-Guidance-

On-Energy-Performance-Contracting.pdf (last visited Feb. 25, 2021).

## ENERGY PERFORMANCE CONTRACTING

### A.   PROGRAM OVERVIEW

29.    HUD's energy performance contracting ("EPC") program is a way that

PHAs

> can increase property values and improve the condition of the public
> housing stock. HUD incentives allow capital funds and any extra
> energy savings from ECMs to be allocated by the housing authority
> toward needed repairs and other eligible expenses. The incentives also
> reduce HUD's payments to public housing authorities for utility bills.

30.   HUD    Incentives   to   Reduce   Utility   Costs,   HUD.GOV,

https://www.hud.gov/program_offices/public_indian_housing/programs/ph/phecc/f

unding (last visited Feb. 25, 2021). This financing does not override HUD's standard

financing system for PHAs, but instead "offer[s] additional options for allocating

savings." *Id.*

### B.   Frozen Baseline Incentive

31.    The frozen base incentive is one of several types of incentives that HUD

offers under its EPC program. This incentive involves freezing the PHA's three-year

rolling base utility consumption that is used for calculating the PHA's operating

subsidy at the pre-improvement level of consumption. *Id.* This frozen baseline is used to determine the PHA's HUD operating subsidy for utilities for the duration of the EPC.

32.     The PHA retains 100% of the cost savings during the contract period, and at least 75% of these yearly profits are used to pay off the loan until it is fully amortized. *Id.* This incentive gives the PHA additional funds to use for energy-conservation improvements compared to other incentives offered under the EPC program. *Id.*

33.     HUD approval of this incentive is based, in part, upon a determination that "payments under the contract can be funded from the reasonably anticipated energy cost savings." *Id.*

34.     For HUD to approve the frozen rolling base incentive, the PHA must submit a:

1.  Cost summary sheet showing ECMs by project, funding type and measurement and verification (M&V) type (the types of M&V are detailed in HUD's M&V guidance, available on the website indicated at the end of this Notice),

2.  Detailed utility baseline data summary sheet showing the [rolling base consumption level] and any adjustments to the data, and

3.  Cash flow [statement], showing:

    a. That the energy savings are sufficient to cover the project costs, including replacement costs.

     b. That 75 percent of the annual energy savings are utilized for payment of the project costs, *i.e.* cost of improvements.

Federal Register Notice FR-5057-I-01, at p. 6.

35.    When the frozen baseline incentive is used, project costs can include, but are not limited to, construction management and administration, equipment, hardware, systems software, financing, costs to control and monitor consumption, project design and development costs, training costs directly related to the maintenance and resident education on energy conservation, and operation of newly installed equipment. *Id.*

### C.    Frozen Baseline Incentive Reporting Requirements

36.    The frozen baseline incentive imposes several annual reporting requirements upon the PHA. The PHA must report the following to HUD annually by April 30th of each year:

1. [D]ocumentation to support that at least 75 percent of the energy savings is being utilized as payment for the project costs. If less than 75% of the savings is used for debt service, HUD will retain the amount of the difference by reducing the project's subsidy by that amount.

2. [D]ocumentation that identifies energy conservation measures installed with HUD funds (e.g., Capital Fund Program) while the RBCL is frozen. HUD will adjust the frozen base, limiting the cost savings retained by the PHA to that which is a result of the EPC-funded ECMs. The PHA is to provide projected consumption reductions for all energy conservation measures installed with HUD funds.

3. [A] copy of the ESCo prepared M&V report for all ESCo developed contracts.

**D.     Frozen Baseline Retained Savings**

37.     HUD's guidance outlines the ways in which a PHA may use retained savings under a frozen baseline EPC:

- For payment of the EPC debt service at other projects under the same EPC contract.
- To address additional energy or green improvements by expanding the current project.
- Acceleration of debt service on the existing project, if permitted under the financing contract.

Federal Register Notice FR-5057-I-01, at p. 6.

38.     HUD encourages PHAs to use "innovative approaches" like EPCs to "achieve programmatic efficiency and reduce utility costs, particularly as PHAs transition to asset management."  FR-5057-I-01, at p. 2.

**E.     Energy Service Companies**

39.     An ESCo is an energy service company that contracts with a PHA to provide improvements under an EPC. Energy Performance Contracting, HUD.gov, https://www.hud.gov/program_offices/public_indian_housing/programs/ph/phecc/eperformance (last visited Feb. 25, 2021). ESCos are entities that are "energy engineering firms" and "other energy engineering consultants" which PHA's hire to manage some or all "an energy/utility project."  *Id.*  HUD uses the acronym EPC

throughout its notice to describe both ESCo and PHA "self-developed energy/utility retrofit projects." *Id.*

### F.   Financing[2] of ECMs

40.    Financing of ECMs occurs in several ways:

- Via a loan from a bank, utility or governmental entity;
- Management of costs under the EPC; or
- Through a shared savings agreement with a *private energy service company*.

*Id.* (emphasis added).

41.    The focus of this qui tam case centers on a frozen baseline EPC with Siemens, a private energy service company.

### G.   Investment Grade Energy Audit- A Component of EPC

42.    A critical initial component of an EPC is the Investment Grade Energy Audit ("IGEA").  Elements of the IGEA include "baseline utility consumption and cost by utility type, ECMs, estimates of the ECM's specific potential for reducing utility costs, the payback or time period over which this potential is realized, along with a defined M&V protocol."  *Id.*

---

[2] The repayment of funds secured through loans is through federal monies. The Rental Assistance Demonstration (RAD) and Energy Performance Contracts (EPCSs),                                                HUD.GOV, https://www.hud.gov/sites/dfiles/PIH/documents/RAD_EPC_FAQs.pdf          (last visited Mar. 3, 2021).

43.     An ESCo or an energy engineering firm conducts the IGEA of facilities affected by an EPC "to determine the potential for energy savings over a utility baseline through such measures as high-efficiency equipment replacements, building upgrades and improved management systems." *Id.*  The utility baseline in an IGEA must correlate to the three-year rolling base that is used to calculate the reimbursement of the PHA's energy expenses. *Id.*

44.     The IGEA sets forth the following:

1. a combination of recommended ECMs into an economically viable package;

2. the reasonably anticipated utility savings required to service the debt attributable to the design, development, installation, and M&V of the combination of ECMs.

3. the combination of ECMs included in the energy/utility project (utility consumption and projected cost savings) "must be sufficient to cover <u>all</u> project related costs (i.e. construction management and administration, equipment, hardware, systems software, financing, costs to control and monitor consumption, project design and development costs, training costs directly related to maintenance and resident education on energy conservation, and operation of newly installed equipment, etc.) over the contract term." *Id.*  Costs associated with operations and maintenance may also be included to the extent that the PHA can show the costs are unique to the new equipment and in addition to the routine maintenance activities provided to the PHA under the current project expense level.  The savings must "persist for the entire term" of the 20-year energy project.  *Id.*

## H.    Capital Investment

45.    The IGEA assesses "the capital investment potential related specifically to energy and utility conservation measures. Traditional capital budgeting techniques give explicit consideration to the time value of money." As of 2011, the IGEA must include "the Net Present Value (NPV) of the project, the Internal Rate of Return (IRR), and the Savings to Investment Ratio (SIR)" which values HUD uses "in its evaluation of energy/utility investments." *Id.*

## I.    Equipment and Equipment Upgrades

46.    When making upgrades to equipment (including, but not limited to, mechanical, electrical, and plumbing systems, residential appliances, windows, lighting, etc.) through an EPC, PHAs must specify Energy Star, Water Sense, of FEMP-designated products. *Id.* For equipment whose useful life is less than the contract term, each round of replacement equipment installed through the EPC must meet the Energy Star, Water Sense, or FEMP designated standards that are current at the time of replacement. *Id.* Any specified equipment that does not meet these standards is not eligible for inclusion in the EPC, unless no such standard exists. *Id.*

## J.    Calculation of Energy Savings

47.    When using HUD's conservation incentives, including the frozen baseline incentive, the PHA assumes the performance risks for the implemented

ECMs. HUD has developed M&V Guidelines to assist PHAs and ESCos in calculating energy savings.

48.     In accordance with 24 C.F.R. 990.185, HUD may approve financial incentives for a PHA once it is determined that payments under a contract can be funded from "reasonably anticipated energy costs." The M&V Guidelines serve as the basis for HUD's determination of such savings.

### K.     M&V Report

49.     The M&V report is an annual report developed by an ESCo, independent third party or the PHA that measures the energy savings resulting from the ECMs installed under the EPC. F.R.-5057-I-01, at p. 14. The reporting intervals for these reports must be adjusted to parallel the HUD utility reporting period for each of the HUD incentives. *Id.* For measures funded by the frozen rolling base, the reporting period is July 1st of each year through June 30th of the following year. *Id.*

### THE FALSE CLAIMS SCHEMES

50.     In early 2008, the HHC solicited ESCos for an EPC for the purpose of financing capital improvements at two developments that are operated by the HHC, Colonel Hamtramck Senior Plaza. Siemens was one of several ESCos that responded to the HHC's request for a proposal.

51.    Siemens provided the HHC with a lengthy packet of its qualifications to render services under an EPC, including details regarding its personnel and the company's previous accomplishments with respect to EPCs.

52.    On April 28, 2008, the HHC engaged Siemens to complete the IGEA that is a prerequisite to the EPC, and to then implement the EPC itself.

53.    After completing the IGEA, Siemens prepared an EPC for HUD's review. The EPC provides for the following improvements to be made to the HHC's facilities:

**Colonel Hamtramck**: Furnace replacements in three hundred (300) dwelling units. Water heat [sic] replacements in one hundred thirty-seven (137) dwelling units. Water device retrofits in three hundred (300) dwelling units. Lighting retrofits in three hundred (300) dwelling units. Upgrade of thirty four (34) electrical closets.

**Senior Plaza**: Installation of one (1) new condensing boiler. Domestic hot water upgrade including replacement of heater and tanks. Water device retrofits in one hundred fifty (150) units and in common restrooms of dwelling unit building. Lighting retrofits in one hundred fifty (150) units and in common interior areas of dwelling unit buildings [sic]. Installation of an expandable and networked Siemens Energy Management System.

**Administration Bldg.**: Installation of seven (7) new programmable thermostats. Lighting retrofits in the common areas of the administration building.

54.    In the EPC, Siemens estimated that the total cost of the proposed improvements would be $2,470,268. The EPC provides that this amount was to be

paid by the HHC to Siemens upon completion of the improvements provided under the EPC.

55.    In addition to the cost of the improvements, the EPC requires that the HHC make yearly technical support program payments to Siemens yearly over 15 years under a graduated payment schedule. Yearly technical support program payments under the EPC begin at $13,384 in year 1 and increase through the final payment of $18,912 in year 15.

56.    The EPC between the HHC and Siemens uses the frozen baseline incentive.

57.    EPCs that use this incentive program allow the PHA to continue receiving funding from HUD at the same levels that it did prior to the implementation of the EPC's improvements based on three-year averages of the PHA's utility consumption.

58.    Siemens used the averages of the HHC's water, electricity, and natural gas consumption for July 2005–June 2006, July 2006–June 2007, and July 2007–June 2008 to calculate an "original baseline" for the HHC. Siemens used the HHC's actual utility consumption for the time periods noted above to calculate this original baseline.

59.    Siemens provided the following table to HUD showing the HHC's original baseline:

| Year | Water/Sewer (Mgal) | Electricity (kWh) | Natural Gas (ccf) |
|---|---|---|---|
| July 2005–June 2006 | 50,482 | 2,193,200 | 29,447 |
| July 2006–June 2007 | 33,517 | 2,176,590 | 31,203 |
| July 2007–June 2008 | 26,318 | 2,228,947 | 31,415 |
| **Average Consumption** | **36,772** | **2,199,579** | **30,688** |

60.     Siemens's analysis did not end there. Rather than simply using the HHC's actual utility usage to calculate its frozen baseline, Siemens arbitrarily adjusted the HHC's baseline water consumption for the purposes of its submission to HUD for approval.

61.     The EPC contains an additional table showing this adjusted frozen baseline:

| Year | Water/Sewer (Mgal) | Electricity (kWh) | Natural Gas (ccf) |
|---|---|---|---|
| July 2005–June 2006 | 67,000 | 2,193,200 | 29,447 |
| July 2006–June 2007 | 44,486 | 2,176,590 | 31,203 |
| July 2007–June 2008 | 38,539 | 2,228,947 | 31,415 |
| **Average Consumption** | **50,008** | **2,199,579** | **30,688** |

As shown by these tables, *Siemens adjusted the HHC's average water usage upwards by over 13,000 million gallons per year*.

62.     Siemens justified this upward deviation of water usage in an appendix to the EPC. where they asserted that "[t]he Colonel Hamtramck [Homes's] water consumptions are [sic] too low for that style multi-family development (63 gallons / person / day (GPD))." Siemens further asserted that "[i]t *appears that the water*

*meter is malfunctioning, possibly a result of being submerged for many months during the year*." (emphasis added).

63.   There was no evidence to support Siemens's assertion that the water meter was malfunctioning. Nor was there evidence to support Siemens' statement the water meter was submerged for many months during the year or that the alleged submersion of the water meter caused it to malfunction.

64.   Siemens additionally represented that "[a]n audit revealed that the existing 1.6 gallons per flush (GPF) toilets are leaking" and that "[d]uring the summer months, the residents water their lawns, fill wading pools and wash cars using the exterior faucets attached to their units."

65.   Based on these false assumptions, Siemens then used "[h]istorical data from five similar multi-family developments . . . to calculate an adjusted baseline." ("assumption data").

66.   None of the assumption data that purportedly came from other developments is supported by documentation.

67.   Based on its average of this assumption data, Siemens concluded that the GPD for Colonel Hamtramck should have been 110.78 instead of the actual 63.

68.     Siemens used this average GPD—which had no relationship to Colonel Hamtramck's actual water usage—to begin calculating its adjusted frozen baseline.[3]

69.     Siemens further adjusted the water usage data for Colonel Hamtramck by adding another 95,108 gallons to its yearly water consumption to account for the alleged "extra consumption for the wading pools and irrigation." Siemens asserted, without evidence, that during the summer months, Colonel Hamtramck's "residents water their lawns, fill wading pools and wash cars using the exterior faucets attached to their units."

70.     Siemens assumed, without evidence, that each and every family residing in Colonel Hamtramck engaged in these activities, consuming 7,316 gallons of water during each week of the 13 weeks of summer.

71.     Siemens assumed, without evidence, that every family residing in Colonel Hamtramck engaged in these activities, consuming 7,316 gallons of water during each week of the 13 weeks of summer.

72.     Siemens failed to explain why Colonel Hamtramck's water meters would not have captured this increased usage.

---

[3] Siemens did not adjust the baseline water figure for Senior Plaza. However, because the M &V process used a combined baseline for the Colonel Hamtramck and Senior Plaza developments, Siemens's artificially inflated baseline for Colonel Hamtramck led to the submission of false claims related to both developments.

73.    Siemens, had no basis to assert the data that it substituted for Colonel Hamtramck's actual water usage was a better representation of that development's water consumption than the amounts reflected in its water bills.

74.    Siemens's creation of the adjusted baseline was based on its representation to HUD and the HHC that that "[i]t appears that the water meter is malfunctioning." However, on November 3, 2006, the City of Hamtramck certified that Colonel Hamtramck's water meter was operating in accordance with the city's specifications.

75.    The City's certification of Colonel Hamtramck's water meter was provided to Siemens while it was preparing the EPC.

76.    Siemens knew or deliberately disregarded the fact that Colonel Hamtramck's water meter was functioning in accordance with the specifications of the billing municipality.

77.    Nevertheless, Siemens persisted in falsely representing that Colonel Hamtramck's water usage was higher than the usage reflected by its water meter by fabricating an adjusted baseline water use for that development.

78.    Siemens used this illegally inflated baseline water consumption figure as a basis to justify the increased capital improvement expenses that HUD otherwise would not have approved and would not have paid. Siemens did this by artificially increasing the utility "savings" that Siemens was able to guaranty under the EPC.

Siemens included a table showing the savings it guaranteed based on the improvements that it was to install under the EPC:

| FIM Name or Type | A<br>Measured Capacity | B<br>Measured Consumption | C<br>Main Meter Comparisons | D<br>Calibrated Simulation | Total |
|---|---|---|---|---|---|
| Lighting | $10,148 | | $37,547 | | $47,695 |
| Water | | | $120,786 | | $120,786 |
| Central Boilers | | | $5,990 | | $5,990 |
| Unit Furnaces | | | $41,260 | | $41,260 |
| Water Heaters | | | $5,920 | | $5,920 |
| EMS | | | $10,752 | | $10,752 |
| Programmable T-Stats | | | $2,353 | | $2,353 |

Importantly, the guaranteed savings for water was significantly higher than for any other component of the EPC. Based on the table above, Siemens guaranteed a total annual savings of $234,756.

79.    HUD's decision to approve an EPC depends, in part, upon a determination that the proposed improvements "can be funded from the reasonably anticipated energy cost savings."   HUD Incentives to Reduce Utility Costs, HUD.GOV,

https://www.hud.gov/program_offices/public_indian_housing/programs/ph/phecc/funding (last visited Feb. 25, 2021).

80.     Siemens's representations regarding guaranteed energy savings were a key component of demonstrating that the $2,470,268 of improvements provided for under this EPC would be funded by those energy savings.

81.     The EPC provides that in the event that the actual annual energy savings realized by HHC are lower than the annual savings that Siemens guaranteed, Siemens is then obligated to pay the amount of the shortfall to the HHC.

## SIEMENS'S INCENTIVES TO ENGAGE IN FALSE CLAIMS ACTIVITIES

82.     Siemens had several incentives to overstate the HHC's pre-EPC water consumption.

83.     By using the artificially inflated adjusted frozen baseline for the HHC's water consumption rather than the HHC's actual water consumption for Colonel Hamtramck, Siemens was able to:

1. justify to HUD more improvements under the EPC than the HHC's actual water consumption would have allowed, thereby enriching Siemens because Siemens made those improvements and was paid for them;

2. offset savings shortfalls from other utilities with excess from HHC's overstated savings on water; and

3. avoid having to pay the HHC for what should have been recorded as a shortfall, thereby shifting the loss to the federal government, which reimburses the HHC for its utility expenditures at the level established by its adjusted frozen baseline.

84.     Thus, the overstated adjusted frozen baseline for the HHC's water consumption in the EPC at issue in this case is central to Siemens's scheme to profit at the expense of the federal Government's coffers.

85.     Siemens prepared the EPC, which the HHC submitted to HUD for review. On November 23, 2010, HUD sent an approval letter (" approval letter") to Relator Kondrat. The approval letter states that HUD approved the total project cost of $2,470,268 and that this amount was payable to Siemens over a 15-year term. HUD also approved the adjusted frozen baseline that Siemens requested, stating that "[a] baseline adjustment is being provided for the water meters at MI 401, Colonel Hamtramck."

86.     The approval letter further indicates that this baseline adjustment was based on Siemens's misrepresentation that the water meter was malfunctioning, stating that "[t]he Hamtramck Housing Commission (HHC) must insure [sic] that the water meters are replaced."

87.     The reports that Siemens compiled for the EPC's M &V process further demonstrate that Siemens's adjustment to the HHC's water baseline was unnecessary and did not reflect Colonel Hamtramck's actual water usage. Every year since Siemens implemented the improvements under the EPC, the purported "actual savings" that the HHC realized significantly exceeded the guaranteed savings that Siemens promised under the EPC:

|  | Guaranteed Savings (MGal) | Actual Savings (MGal) | Variance (MGal) |
|---|---|---|---|
| Year 1 | 23,287 | 37,117 | 13,830 |
| Year 2 | 23,287 | 33,273 | 9,986 |
| Year 3 | 23,287 | 37,376 | 14,088 |
| Year 4 | 23,287 | 42,845 | 19,558 |
| Year 5 | 23,287 | 42,946 | 19,659 |
| Year 6 | 23,287 | 42,279 | 18,992 |
| Year 7 | 23,287 | 33,968 | 10,681 |

88.     The M &V reports also show that the baseline adjustment for water was unnecessary because the HHC's actual water consumption *never exceeded* the original baseline of 36,772 million gallons per year that Siemens calculated based on HHC's actual water usage from the three years preceding the EPC:

|  | Actual Baseline Water Consumption (MGal) | Adjusted Baseline Water Consumption (MGal) | Actual Water Usage (MGal) |
|---|---|---|---|
| Year 1 | 36,772 | 50,008 | 12,242 |
| Year 2 | 36,772 | 50,008 | 16,086 |
| Year 3 | 36,772 | 50,008 | 11,984 |
| Year 4 | 36,772 | 50,008 | 7,162 |
| Year 5 | 36,772 | 50,008 | 7,061 |
| Year 6 | 36,772 | 50,008 | 18,504 |
| Year 7 | 36,772 | 50,008 | 16,039 |

Significantly, most of these readings took place after the HHC installed new water meters as HUD directed.

89.     The fact that the HHC's actual water usage never even approached the actual baseline water consumption that Siemens arbitrarily deemed as "too low"

shows that its upward adjustment of over 13,000 million gallons per year was unwarranted and that the water meters did not need to be replaced.

90.     The inflation of the adjusted frozen baseline for water allowed Siemens to offset shortfalls in other utilities with no financial consequences. In contrast to the alleged water savings, Siemens has failed to deliver the electricity savings it guaranteed, grossly underperforming every year of the EPC to date:

|         | Guaranteed Savings (kWh) | Actual Savings (kWh) | Variance (kWh) |
|---------|--------------------------|----------------------|----------------|
| Year 1  | 635,253                  | 331,563              | -303,690       |
| Year 2  | 635,253                  | 541,647              | -93,606        |
| Year 3  | 635,253                  | 280,780              | -354,472       |
| Year 4  | 635,253                  | 290,007              | -345,245       |
| Year 5  | 635,253                  | 6,763                | -628,490       |
| Year 6  | 635,253                  | 58,003               | -577,250       |
| Year 7  | 635,253                  | 115,163              | -520,090       |

(emphases added).

91.     The same is true of Siemens's guarantees regarding the HHC's gas usage:

|         | Guaranteed Savings (CCF) | Actual Savings (CCF) | Variance (CCF) |
|---------|--------------------------|----------------------|----------------|
| Year 1  | 94,165                   | 38,133               | -56,032        |
| Year 2  | 94,165                   | 13,463               | -80,702        |
| Year 3  | 94,165                   | 68,705               | -25,460        |
| Year 4  | 94,165                   | 45,500               | -48,660        |
| Year 5  | 94,165                   | 32,500               | -61,660        |
| Year 6  | 94,165                   | 7,130                | -87,400        |
| Year 7  | 94,165                   | 3,220                | -90,940        |

92.     (emphases added) Notwithstanding its yearly significant shortfalls in electricity and gas savings, the inflated adjusted baseline for water enabled Siemens to misleadingly tout overall savings in five out of the seven years of the EPC to date, and smaller-than-actual losses in two of those years:

|  | Guaranteed Savings ($) | Actual Savings ($) | Variance ($) |
|---|---|---|---|
| Year 1 | $234,756 | $257,650 | $22,894 |
| Year 2 | $242,972 | $256,735 | $13,763 |
| Year 3 | $251,476 | $294,563 | $43,087 |
| Year 4 | $260,278 | $331,816 | $71,538 |
| Year 5 | $269,388 | $299,436 | $30,048 |
| Year 6 | $278,817 | $218,301 | -$60,516 |
| Year 7 | $288,575 | $237,727 | -$50,848 |
| **Total** | **$1,826,262** | **$1,896,228** | **$69,966** |

93.     But for Siemens's overstatement of the HHC's baseline water consumption for Colonel Hamtramck, there would have been an overall savings shortfall every year of the EPC.

94.     Due to the overall savings used for the M &V process, Siemens was able to avoid adverse consequences under the EPC at the expense of the Government, which was misled into approving the EPC based on Siemens's exaggeration of the water consumption savings generated under the EPC.

95.     Siemens's illegal conduct resulted in significant losses to the federal Government's coffers.

96.    As a PHA, the HHC is funded by an operating subsidy that is paid by HUD based on the HHC's expenses. *See* Public Housing Programs, HUD.GOV, https://www.hud.gov/program_offices/public_indian_housing/programs/ph/progra ms#:~:text=The%20Public%20Housing%20Operating%20Fund,Act%20of%20193 7%2C%20as%20amended (last visited Feb. 25, 2021).

97.    The artificially inflated adjusted frozen baseline that Siemens formulated for the HHC's water consumption caused HUD to pay the HHC a larger operating subsidy than it otherwise would have received.

98.    All the operating subsidies that the HHC have received from the Government since the implementation of the EPC have been the result of false claims that were caused by Siemens's misrepresentations.

99.    Siemens has reaped the benefit of the Government's overpayments. Siemens was paid $2,470,268 for the capital improvements that it installed under the EPC, which was paid with financing that the HHC obtained, and this financing is being repaid, plus interest, by the Government.

100.   Siemens has obtained other ancillary benefits from the EPC as well. In connection with the improvements that it constructed under the EPC, Siemens encouraged the HHC to apply for a grant from HUD under the American Reinvestment and Recovery Act. The HHC ultimately obtained a $1.1 million grant,

which was paid to Siemens so it could install transformers in connection with the electrical improvements that were made under the EPC.

101.   The HHC would have not received the $1.1 million grant and paid monies to Siemens but for the EPC, which would not have been approved by HUD but for Siemens's misrepresentations regarding the accuracy of Colonel Hamtramck's water meters and water consumption.

102.   Siemens's ill-gotten gains from this fraudulent scheme are in excess of $3.5 million.

## COUNT I

## FEDERAL FALSE CLAIMS ACT-31 U.S.C. § 3729(a)(1)(A)

103.   Relators incorporate by reference the preceding allegations in Paragraphs 1 through 102 inclusive.

104.   This is a claim for treble damages and civil penalties against Defendants under the FCA, 31 U.S.C. § 3729(a)(1)(A), for knowingly presenting, or causing to be presented, false or fraudulent claims for payment or approval to the United States.

105.   Defendants have violated 31 U.S.C. § 3729(a)(1)(A) by knowingly presenting or causing to be presented false or fraudulent claims to HUD as described in detail above.

106.   The United States, unaware of the foregoing circumstances and conduct, and in reliance on the truth and accuracy of the claims for payment, paid or

authorized payment of those claims and has been damaged in an amount to be proven at trial.

## COUNT II

## FEDERAL FALSE CLAIMS ACT-31 U.S.C. § 3729(a)(1)(B)

107.   Relators incorporate by reference the preceding allegations in Paragraphs 1 through 106 inclusive.

108.   This is a claim for treble damages and civil penalties against Defendants under the FCA, 31 U.S.C. § 3729(a)(1)(B), for knowingly making, using, or causing to be made or used, a false record or statement material to false or fraudulent claims paid or approved by the United States.

109.   As described in the allegations above regarding Defendants' schemes, Defendants have violated 31 U.S.C. § 3729(a)(1)(B) by knowingly making, using, or causing to be made or used, false records or statements material to claims for payment paid by HUD.

110.   The United States, unaware of the foregoing circumstances and conduct, and in reliance on the truth and accuracy of the claims for payment, paid or authorized payment of those claims and has been damaged in an amount to be proven at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Relators demand that judgment be entered in favor of the United States and against Defendants for the maximum amount of damages, and such other relief as deemed appropriate on each Count. This request includes with respect to the United States, three times the amount of damages to the United States, plus civil penalties of no more than $11,000 and no less than $5,500 for each false claim submitted on or before November 2, 2015 and civil penalties of no more than $22,363 and no less than $11,181 for each false claim submitted on or after November 3, 2015, and any other recoveries or relief provided for under the Federal FCA.

Further, Relators request that they receive the maximum amount permitted by law from the proceeds or settlement of this action as well as from any alternative remedies collected by the United States plus reasonable expenses necessarily incurred and reasonable attorneys' fees and costs. Relator requests that their award be based upon the total value recovered, both tangible and intangible, including any amounts received from individuals or entities who are not parties to this action.

Respectfully submitted,
HERTZ SCHRAM PC

By:   _/s/ Patricia A. Stamler_
PATRICIA A. STAMLER (P35905)
*Attorneys for Plaintiffs-Relators*
1760 S. Telegraph Road, Suite 300
Bloomfield Hills, MI  48302
(248) 335-5000
pstamler@hertzschram.com

## <u>DEMAND FOR TRIAL BY JURY</u>

NOW COME Plaintiffs-Relators, KEVIN KONDRAT and JESSICA JONES, on behalf of themselves and the United States of America and the State of Michigan, by and through their attorneys, HERTZ SCHRAM PC, and hereby demand a jury trial in the above-captioned matter.

Respectfully submitted,

HERTZ SCHRAM PC

By:    */s/ Patricia A. Stamler*
PATRICIA A. STAMLER (P35905)
*Attorneys for Plaintiffs-Relators*
1760 S. Telegraph Road, Suite 300
Bloomfield Hills, MI  48302
(248) 335-5000
pstamler@hertzschram.com

Dated: March 16, 2021